OSCN Found Document:IN THE MATTER OF A.F.K.

 
 
 
 OSCN navigation


 
 Home

 
 Courts

 
 Court Dockets

 
 Legal Research

 
 Calendar

 
 Help
 





 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 

 
 
 
 IN THE MATTER OF A.F.K.
2014 OK CIV APP 6
317 P.3d 221
Case Number: 111622; Cons. w/111625
Decided: 12/05/2013
Mandate Issued: 01/03/2014
DIVISION III
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION III
Cite as: 2014 OK CIV APP 6, 317 P.3d 221

IN THE MATTER OF A.F.K.; M.J.K. and M.A.K., DEPRIVED 
CHILDREN:

DENISE KNIGHT, Appellant,
v.
STATE OF OKLAHOMA, 
Appellee.

APPEAL FROM THE DISTRICT COURT OF
LINCOLN COUNTY, 
OKLAHOMA
HONORABLE SHEILA KIRK, TRIAL JUDGE

AFFIRMED

Mathew Thomas, STUART, CLOVER, DURAN, THOMAS & VORNDRAN, Shawnee, 
Oklahoma, for Appellant Mother,
Russ B. Haskins, Shawnee, Oklahoma, for 
Appellant Father,
Tracy L. McDaniel, Lincoln County District Attorney's 
Office, Chandler, Oklahoma, for Appellee,
Traci L. Soderstrom, Del City, 
Oklahoma, for Minor Children.


BRIAN JACK GOREE, Judge:
¶1 This is an appeal of an order terminating parental rights following a jury 
trial. The State of Oklahoma alleged the parents failed to correct the 
conditions which led to the finding that their children were deprived. The 
parents were given notice of the conditions that needed to be corrected in 
September of 2011 and the State's motion to terminate parental rights, based on 
those same conditions, was filed in December of 2012. Six verdict forms were 
completed by the jury, one for each parent as to each of their three children. 
The verdict forms contain special interrogatories, and the jury specified the 
precise conditions they found the parents had failed to correct. The termination 
order includes findings that the parents were permitted not less than three 
months to correct the conditions, that termination is in the best interest of 
the children, and that the conditions alleged in the Petition were not 
corrected. The order does not specifically identify the conditions that were not 
corrected. But neither parent seeks reversal based on an objection to the form 
of the termination order.[1]
¶2 Three issues are presented for our review: (1) whether the State presented 
clear and convincing evidence to support the verdicts, (2) whether the State 
made reasonable efforts to return the children to their home, and (3) whether an 
indigent parent received effective assistance of counsel. For the reasons that 
follow, we affirm.
¶3 On June 16, 2011, State filed a petition alleging M.A.K., M.J.K., and 
A.F.K. (Children) were deprived because of (1) exposure to domestic violence, 
(2) exposure to substance abuse, (3) lack of a permanent residence, and (4) 
being left [with] or being exposed to inappropriate care givers. The petition 
identified the parents as Denise Knight (Mother) and Levi Knight (Father).
¶4 On August 22, 2011, the case came on for adjudication and both parents 
stipulated to the allegations in the petition. On September 22, 2011, Mother 
appeared personally and Father appeared by his counsel at a disposition hearing. 
The Disposition Order adopted an Individualized Service Plan (ISP) and advised 
Mother and Father "that failure to comply with any requirements of the treatment 
plan or any requirements of the Court including failing to appear at any court 
hearing may result in the loss of custody of the children or the termination of 
parental rights to the children." The September 2011 ISP was given to both 
parents. Below the section entitled, "Conditions or Behaviors which need to be 
changed or corrected" the ISP states: "Parents need to not engage in domestic 
violence in the home. Parents need to protect their children from dangerous 
people. Parents need to not abuse substances. Parents need to have a stable 
home." We observe that the allegations of the Petition which led to the 
adjudication that Children were deprived are consistent with the conditions set 
forth in the ISP that parents needed to correct.[2]
¶5 The ISP required each Parent to attend domestic violence classes, attend 
drug and alcohol education groups, submit to random drug testing, obtain legal 
and verifiable means of income, obtain adequate stable housing, follow through 
with medical professionals to assure M.A.K.'s medical needs are met,[3] complete a 
parenting course, visit Children as ordered by the trial court or by the DHS 
worker, contact DHS worker at least once a month or as ordered by the trial 
court, attend any scheduled court hearings, and pay child support as ordered by 
the trial court.
¶6 On December 5, 2012, more than one year after Children were removed from 
Parents' custody, State filed a Motion to Terminate Parental Rights seeking 
termination of both Parents' parental rights. It alleged, pursuant to 10A O.S. 
Supp. 2009 §1-4-904(B)(5), Parents failed to correct the conditions which led to 
Children being adjudicated deprived, despite having been given more than three 
months to correct the conditions. It also alleged it was in the best interest of 
Children to terminate Parents' parental rights.[4]
¶7 Each of the verdict forms provided:

 
 We, the jury, empaneled and sworn in the above entitled cause, do upon 
 our oaths, find that the parental rights of [Parent] should be terminated on 
 the statutory ground that after being permitted a period of time not less 
 than three (3) months to correct the conditions which led to the finding 
 that the child is a deprived child, [Parent] has failed to do so. The 
 conditions that have not been corrected which led to the finding that the 
 child is a deprived child are:
 ___ Domestic Violence
 ___ Protect your children and refrain from exposing yourself and your 
 children to dangerous or inappropriate individuals
 ___ Substance Abuse
 ___ Maintain a safe and stable home
All six verdict forms bear check marks next to each of the conditions.[5]
¶8 On February 27, 2013, the trial court entered an Order terminating 
Parents' parental rights to Children in accordance with the verdicts. Mother 
appeals (Case No. 111,622) and Father appeals (Case No. 111,625). The appeals 
were consolidated pursuant to Okla. Sup. Ct. R. 1.27(d) under the surviving Case 
No. 111,622.
¶9 Appellate review of parental termination decisions must be based upon the 
clear-and-convincing evidence standard. Matter of S.B.C., 2002 OK 83, ¶6, 64 P.3d 1080, 1082. The factual 
findings must rest on clear and convincing proof. State ex rel. A.W., 2011 OK CIV APP 27, ¶7, 250 P.3d 343, 346.
Safe and Stable Home
¶10 According to the ISP, one reason the Department of Human Services 
intervened was that Father and Mother moved with the children from one home to 
another within a period of a few months or even weeks. In March of 2012, six 
months before the State filed its motion to terminate, Parents acquired some 
land near Sparks, Oklahoma and they were given the shell of a used mobile 
home.
¶11 A child welfare specialist testified for the State. She stated the home 
was unsafe because it did not have skirting around the base, thereby permitting 
children to access the area under the home which included wiring that was 
hanging down and could be dangerous. She also testified there was trash lying 
around, as though a bag of household garbage had been emptied onto the yard. 
There were piles of tires, mattresses, bottles, and paper. There was a 
depression in the yard where a child could fall two or three feet. The stairs 
leading to the front door were too high and there was no handrail. The wiring to 
the front porch light was partially exposed. The child welfare specialist stated 
she did not observe the inside of the home.
¶12 Father testified that when he was given the trailer, it was gutted. It 
was one big open area with no walls, poor flooring, no light switches, no wall 
plugs, no water heater, and no toilet. It was an empty shell. He has 15 years of 
experience in construction and knows how to build houses.
¶13 He built walls to create a living room, hallway, and bedrooms. He added a 
stove and microwave in the kitchen and installed plumbing items including a new 
toilet, bathtub, shower, and hot water tank. He replaced the floor with new 
plywood. He applied sealant to the new floors, painted the new walls, and 
installed some carpet. He then installed a service pole for the electricity and 
relied on the expertise of a licensed electrician to inspect the wiring and 
perform the final connections before turning on the power.
¶14 When Father and Mother bought the property, it included an old foundation 
of a home that had burned and the basement was exposed. They filled it in with 
multiple loads of pea gravel but a portion is still below grade, which explains 
the depression the child welfare worker described. Father agreed the home is not 
finished after eleven months of work. He also conceded it is still not safe for 
the children, but he is working on it. Mother argues their efforts to make the 
home an appropriate residence for their children constitutes evidence of a 
corrected condition. The record contains 16 photographs depicting the condition 
of the land and the mobile home. The photos are consistent with the testimony of 
Father as well as the DHS worker, except they do not show trash in the yard.
¶15 Father and Mother made significant progress in building a suitable 
dwelling from the time they acquired their property in March of 2012 to the date 
the State filed its motion to terminate their parental rights in December of 
2012. The unsafe conditions identified by the State can be corrected within a 
short period of time when compared to the work they have already invested in 
their home. For example, the metal skirting would deter the children from being 
exposed to dangerous conditions underneath a mobile home. Father testified he 
has the missing skirt material on hand and it would take him one week to replace 
it. We believe the other deficiencies of the home identified by the state can 
also be corrected in a relatively short time period. We acknowledge Father's 
candid admission that the house is not yet safe for his children. The jury found 
that both parents failed to correct the condition of maintaining a safe and 
stable home. We hold that the order terminating Father and Mother's parental 
rights, insofar as it is based upon failure to correct the condition of 
maintaining a safe and stable home, is not supported by clear and convincing 
evidence.
Domestic Violence
¶16 In 2011, prior to Children being removed, Children told the DHS worker 
that Parents hit and punched each other in the face and on the back. There is a 
history of violence between the Parents which led to the requirement in the ISP 
that they complete domestic violence classes.
¶17 Mother completed a domestic violence inventory, which is a diagnostic 
tool to help determine if the individual has been in a violent relationship or 
has tendencies that could lead to domestic violence. Based on answers to the 
inventory questions, the evaluator will make recommendations for any counseling 
services that might be necessary or beneficial. The September 2011 ISP required 
Mother to attend domestic violence classes, but she did not submit to the 
domestic violence inventory until November of 2012, more than a year later and 
only one week before the State filed its motion to terminate her parental 
rights.
¶18 At trial, Regan Green testified on behalf of Mother. Ms. Green is an 
advocate for Project Safe, which is the service provider that conducted Mother's 
domestic violence inventory. Based on Mother's inventory responses, no domestic 
violence services were recommended. However, Mother nevertheless participated in 
an eight-week class and attended seven of the sessions. On cross-examination, 
Ms. Green admitted it is important that she know the history of a client's 
domestic violence when recommending appropriate services. She then testified 
that Mother had not disclosed that a protective order had been issued between 
Mother and Father. Neither had Mother advised her that Father had been arrested 
for domestic violence against Mother. Further, she was not told that Mother 
continued living with Father despite the fact that Father had not received 
domestic violence treatment. When Mother testified at trial, she admitted she 
had not reported her domestic violence history on her inventory or to Ms. Green. 
In fact, she admitted she never disclosed to Ms. Green that she had been a 
victim of domestic violence.
¶19 Mother claims the most recent incident of domestic violence occurred in 
2009, long before Children were adjudicated deprived. She claims this is not 
evidence of an uncorrected condition and there is no evidence of domestic 
violence after Children were removed from the home.
¶20 Father completed a domestic violence inventory in June of 2011. He was 
required by the September 2011 ISP to participate in domestic violence 
counseling. As a result of Father's 2010 conviction for domestic assault and 
battery (he pleaded no contest), he was sentenced to complete a 52-week domestic 
violence counseling program. The child welfare specialist testified that even 
though the law permits a motion to terminate if a parent has not corrected the 
conditions (that led to the deprived adjudication) within 90 days, the practice 
of DHS is to allow parents a full year before recommending termination. At the 
time of trial, Father had attended only four sessions of his 52-week domestic 
violence counseling program.
¶21 Failure to comply with an ISP is not, in itself, grounds for termination 
of parental rights, but noncompliance with the plan may be considered as 
evidence that parental rights should be terminated because the parent has been 
unable to correct conditions leading to the child's deprived status. Matter 
of L.S., 2013 OK CIV APP 21, 
¶14, 298 P.3d 544, 549. The 
Court of Civil Appeals in Matter of L.S. stated:

 
 [The father's] inability to comply with the terms of the ISP and follow 
 often simple directives that were repeated at each visitation was especially 
 concerning, particularly in light of the fact that being a single father to 
 a toddler would be much more difficult than complying with the ISP itself. 
 Compliance with the ISP was a chance for Father to demonstrate he had met a 
 standard of conduct expected of him in order to correct the conditions 
 leading to the deprived adjudication and be in a position to responsibly 
 parent L.S. In re S.A., 2007 OK CIV APP 97, ¶12, 169 P.3d 730, 735. The State 
 proved by clear and convincing evidence that Father was unable to meet this 
 level of parental competence and the jury agreed. In re State of Oklahoma 
 In the Interest of K.P., 2012 OK CIV APP 32, ¶22, 275 P.3d 161, 166-67 (failure 
 to comply with the ISP service plan, in itself, is not grounds for 
 termination of parental rights, but noncompliance with the plan may be 
 considered as evidence that parental rights should be terminated, because 
 the parent has been unable to correct conditions leading to the child's 
 deprived status).
¶22 In the present case, Father did not complete the ISP requirements which 
would have demonstrated he had met a standard of conduct expected of him in 
order to correct the condition relating to domestic violence. Mother attended 
seven classes on her own terms - after delaying more than a year and then 
purposefully hiding material facts directly relating to her domestic abuse 
history. The jury could reasonably have concluded her dishonesty resulted in 
avoidance of necessary treatment. We hold that noncompliance with the ISP is 
evidence Father and Mother did not correct the condition of not engaging in 
domestic violence in the home. Matter of L.S., 2013 OK CIV APP 21, ¶14, 298 P.3d 
at 549. The order terminating Father and Mother's parental rights based upon 
failure to correct the condition of domestic violence is supported by clear and 
convincing evidence.
Substance Abuse
¶23 Mother argues the State's only evidence relating to substance abuse was 
that she took legally prescribed medications. Father testified Mother was 
bipolar; however, until trial, neither the trial court nor DHS had ever been 
informed that Mother had this affliction. By the time of trial, Mother presented 
prescriptions for the drugs Xanax, an anti-anxiety drug, and Lortab, an opiate, 
but there was no evidence of any physician's records describing an affliction 
requiring those drugs. During the time Parents were working on the ISP, Mother 
frequently tested positive for these prescription drugs.
¶24 In order to correct the condition of substance abuse, the ISP required 
Mother to attend drug and alcohol education groups. She submitted to drug 
assessments that totaled five hours. She had a treatment session for fifteen 
minutes in October of 2011, a 45-minute individual counseling session in 
November, and two separate 90-minute group sessions in December. In January of 
2012 she had a 30-minute session and a 60-minute session a few weeks later. She 
stopped attending sessions after losing her job in January of 2012 and did not 
complete the treatment program. Father does not contend he corrected the 
condition of substance abuse.
¶25 Because Mother did not complete her treatment program after being given 
more than one year to do so, and Father does not take issue with the findings of 
the jury, we hold the order terminating Father and Mother's parental rights 
based upon failure to correct the condition of substance abuse is supported by 
clear and convincing evidence.
Inappropriate Care Givers
¶26 Regarding exposure to inappropriate care givers, Mother points out that 
before the Children were adjudicated deprived, Father was assaulted by his 
brother, Tanner Schepp, who had threatened to kill Father's family. Father 
obtained a protective order against him after Children were removed from the 
home. She claims there is no evidence Children have been exposed to 
inappropriate care givers since they were removed from the home.
¶27 Of course, because Children have been in the physical custody of a foster 
parent since their removal, Parents have not had an opportunity to expose them 
further to inappropriate care givers. However, because Parents previously had 
exposed Children to several inappropriate care givers with criminal records who 
also had their own children removed from their custody, the ISP required them to 
complete parenting classes, as well as the substance abuse and domestic violence 
classes to demonstrate a standard of conduct expected of them in order to 
correct the conditions leading to the deprived adjudication and be in a position 
to responsibly parent their Children. See Matter of L.S., 2013 OK CIV APP 21, ¶14, 298 P.3d 544, 549.
¶28 In the present case, as in Matter of L.S., Mother did not complete 
any ISP requirements which would have demonstrated she had met a standard of 
conduct expected of her in order to correct the condition which led to the 
deprived adjudication. Even though failure to comply with the ISP is not, in 
itself, grounds for termination of parental rights, Mother's noncompliance may 
be considered as evidence her parental rights should be terminated because she 
failed to correct conditions leading to Children's deprived status. Father does 
not contend he corrected this condition. We hold the order terminating Father 
and Mother's parental rights based upon failure to correct the condition of 
exposure of the children to inappropriate care givers is supported by clear and 
convincing evidence.
Reasonable Efforts
¶29 Citing 10A O.S. 2011 §1-1-102(B)(5),[6] Father urges because of his health and 
financial limitations, DHS did not make reasonable efforts to assist him in 
correcting conditions leading to the deprived adjudication, and that it did not 
provide financial help to pay for ISP-required classes.
¶30 Father testified he had an umbilical hernia surgically repaired shortly 
after Children were removed from the home, the surgery failed, and he had 
another surgery. He scrapped metal for income, earning from $70.00 to $900.00 
per month. He also complained the gasoline expense was $55.00 or $60.00 to visit 
Children in their foster home in Ada.[7]
¶31 It is Parents' responsibility, not DHS's responsibility, to correct the 
conditions which led to the deprived adjudication of Children. 10A. O.S. 2011 
§1-4-904(B)(5)(a). Mrs. Walker, a DHS child investigation worker, worked with 
Parents before Children were removed from their custody. Based on referrals in 
January, February and April 2011 from a statewide hotline, she investigated the 
family's home situation. She spoke with Parents on several occasions about 
voluntary services which included domestic violence counseling, substance abuse 
counseling, housing assistance, and financial assistance. From January 2011 
through June 2011 when Children were removed, Parents did not seek or receive 
these voluntary services. Because of Parents' failure to cooperate with her, she 
had to close out the earlier referrals.
¶32 After Children were removed from Parents' custody in June 2011, Mrs. 
Zumstein, the DHS worker assigned to Parents, testified that several times she 
referred Parents to the website and the telephone number for the Department of 
Rehabilitation Services which ". . . would have helped them with money to get to 
retraining. It would have helped with transportation to get to stuff like that 
which would have helped them." Again, Parents did not seek or receive assistance 
from this service. Both before and after removal of Children, by informing and 
encouraging Parents to avail themselves of voluntary services, DHS made 
reasonable efforts to prevent the need for removal of Children and to return 
Children to the home.
Effective Legal Counsel
¶33 Mother also contends she lacked effective assistance of legal counsel. In 
her brief-in-chief, she stated:

 
 Here, counsel for the Mother presented a disjointed and rambling case 
 which confused and misled the finders of fact in this cause. Counsel for the 
 Mother made innumerable and duplicative objections which lacked any legal 
 basis, interrupted witnesses, and attempted to present extra-legal 
 requirements into jury instructions.
¶34 Mother also stated that, "[e]ven if the State had presented evidence 
sufficient to meet the burden to establish the necessity of termination of 
parental rights, because the Mother lacked effective assistance of legal 
counsel, the matter should be reversed and remanded for proceedings in which the 
Mother might receive adequate representation."
¶35 In parental rights termination cases, because the parties have a 
constitutional and statutory right to be represented by an attorney, there 
attaches the concomitant "right to effective assistance of counsel." Matter 
of D.D.F., 1990 OK 89, ¶15, 
801 P.2d 703, 707.[8] In 
Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 
674 (1984), the United States Supreme Court held that a criminal defendant's 
claim that representation was so deficient so as to require reversal must show 
(1) that the attorney's performance was deficient and (2) the deficient 
performance prejudiced the defense. The Court also stated that "[j]udicial 
scrutiny of counsel's performance must be highly deferential." Id. at 
689. In Matter of K.L.C., 2000 CIV APP 98, ¶9, 12 P.3d 478, 481, the Court of Civil 
Appeals took guidance from criminal cases and reasoned, "[i]n reviewing a claim 
of ineffective assistance of counsel, we look at the proceedings as a 
whole."
¶36 In reviewing these proceedings, Mother has not shown her counsel's 
performance was deficient; in fact, it appears Mother's counsel zealously 
represented her. Neither has Mother shown how this representation prejudiced 
her.[9] Looking 
at the proceedings as a whole, it is clear Mother did not meet her burden of 
proving ineffective assistance of counsel.

¶37 AFFIRMED.

HETHERINGTON, P.J., adopts Judge Mitchell's specially concurring 
opinion.


MITCHELL, J., concurring specially:
¶38 Although I highly approve of the verdict forms used in this case, the 
termination order is lacking. We have held previously that the termination order 
based on a failure to correct conditions must identify the uncorrected 
conditions on which termination is based. Matter of R.A., W.A., Z.A. and 
A.A., 2012 OK CIV APP 65, 
¶17, 280 P.3d 65; Matter of B.M.O., 1992 OK CIV APP 89, 838 P.2d 38; Matter of E.M., 
1999 OK CIV APP 32, 976 P.2d 1098; Matter of 
B.C., 2010 OK CIV APP 103, 
242 P.3d 589. The termination 
order in the instant case acknowledges the jury's findings, but fails to 
identify the uncorrected conditions on which termination is based. The order 
should identify the specific grounds for terminations and, if based on a failure 
to correct conditions, specifically identify those uncorrected conditions. I 
fully concur in all other respects.

FOOTNOTES

[1] In its 
Order, the trial court found: "The Jury found by clear and convincing evidence 
that the children were adjudicated as deprived on August 22, 2011, that [Parents 
have] failed to correct the conditions alleged in the State's Petition filed 
June 16, 2011, which resulted in the deprived adjudication, that [Parents have] 
been permitted a period of time of not less than three (3) months to correct the 
conditions which [led] to the finding that the children are deprived, that 
continued custody by the [Parents] is likely to result in serious emotional or 
physical damage to the children as supported by the testimony of witnesses, and 
it is in the best interest of the Respondent Juveniles to terminate the parental 
rights of [Parents] in and to the Respondent Juveniles, [A.K., M.K., and 
M.K.]."

[2] In the 
ISP, the reasons for the involvement of the Department of Human Services (DHS) 
were:
The children were removed on 06/08/11 and placed in emergency OKDHS custody. 
The family has substantial CW history that involves confirmed history regarding 
Substance Abuse by Levi and Denise, Exposure to Domestic Violence, and Abuse 
Kicking. The family has been offered services in these previous referrals. Also, 
Levi and Denise have FAILED TO COOPERATE with OKDHS on at least two occasions, 
January 2011 and April 2011. Levi and Denise are not providing a safe and stable 
home for their children often moving from home to home within a matter of months 
or weeks. They have, around April 2011, resided with Carolyn Stewart who is 
currently facing felony Child Neglect charges. They have also, in the past and 
currently, resided with Tanner Schepp who has significant and violent criminal 
history that involves Shooting With Intent to Kill. Tanner also has confirmed 
history that involves Domestic Violence which resulted in his current 
girlfriend's child being removed from his care. Levi and Denise have told CW in 
a past referral (RES 1372157) that Tanner has threatened to kill their children 
during a physical altercation that took place in front of their children. The 
children told the worker they see their parents punch and hit each other in the 
face and on the back when they argue. The children state this makes them sad. 
The children also stated they see Levi drink Whiskey on a daily basis and state 
he falls down and throws up when he drinks. Levi and Denise are allowing their 
children around Kelly Burns who had her own child removed by CW due to domestic 
violence between she and Tanner Schepp. Denise states she has allowed Tanner and 
Kelly to watch the children unsupervised with their children. Denise and Levi 
both stated they are living "here and there" and currently do not have a 
home.

[3] A 
pediatric cardiologist recommended M.A.K.'s heart condition be surgically 
repaired.

[4] Section 
1-4-904 provides, in part:
A. A court shall not terminate the rights of a parent to a child 
unless:
1. The child has been adjudicated to be deprived either prior to or 
concurrently with a proceeding to terminate parental rights; and
2. 
Termination of parental rights is in the best interest of the child.
B. The 
court may terminate the rights of a parent to a child based upon the following 
legal grounds:
. . .
5. A finding that:
a. the parent has failed to correct the condition which 
led to the deprived adjudication of the child, and
b. the parent has been 
given at least three (3) months to correct the condition,
. . .

[5] We 
commend the trial court for submitting separate verdict forms that permitted the 
jury to specify the precise conditions it found each parent did not correct with 
respect to each child. Separate verdict forms are appropriate when an action is 
tried to a jury on two or more separate causes of action. Quarles v. 
Panchal, 2011 OK 13, ¶5, 250 P.3d 320, 322. In this case, 
each verdict form constitutes a general verdict as required by 12 O.S. 2011 §587 because it is a 
complete pronouncement on the issue of termination, as opposed to a finding of 
facts alone. By including a line for a checkmark beside each of the alleged 
conditions, the court directed the jury to make findings as to particular 
questions of fact, a procedure approved by 12 O.S. 2011 §588. So long as the 
verdict is wholly determinative of the issue tried, special findings of fact do 
not deprive the verdict of its generality. Smith v. Gizzi, 1977 OK 91, ¶12, 564 P.2d 1009, 1013.

[6] The 
statute states it is the purpose of the laws relating to children alleged or 
found to be deprived to "[m]ake reasonable efforts to prevent or eliminate the 
need for the removal of a child from the home and make reasonable efforts to 
return the child to the home unless otherwise prescribed by the Oklahoma 
Children's Code.

[7] Parents 
traveled to Ada from their home in Sparks in rural Lincoln County to visit 
Children only four times. For other visits, the foster mother drove Children to 
visit Parents, usually meeting them in Shawnee.

[8] The 
Oklahoma Supreme Court has determined that threatened termination of parental 
rights "requires the full panoply of procedural safeguards must be applied to 
child deprivation hearings. This includes the right to counsel. Matter of 
Chad S., 1978 OK 94, ¶12, 580 P.2d 983, 985. That case also 
adopted the rationale that child dependency hearings equate to criminal 
trials.

[9] When an 
attorney takes no action on behalf of his client, there is a legal presumption 
of prejudice, an exception to the satisfaction of both prongs of the 
Strickland requirement. Young v State, 1994 OK CR 84, ¶9, 902 P.2d 1089, 
1090.





 Citationizer© Summary of Documents Citing This Document
Cite
 Name
 Level
 None Found.
Citationizer: Table of Authority
Cite
 Name
 Level
 Oklahoma Court of Criminal Appeals Cases Cite
Name
Level 1994 OK CR 84, 902 P.2d 1089, YOUNG v. STATE
Discussed
Oklahoma Court of Civil Appeals Cases Cite
Name
Level 1992 OK CIV APP 89, 838 P.2d 38, 63 OBJ 3043, B.M.O., Matter of
Discussed 2007 OK CIV APP 97, 169 P.3d 730, IN THE MATTER OF S.A.
Discussed 2010 OK CIV APP 103, 242 P.3d 589, IN THE MATTER OF B.C.
Discussed 2011 OK CIV APP 27, 250 P.3d 343, IN THE MATTER OF THE STATE IN THE INTEREST OF A.W. and M.W.
Discussed 2012 OK CIV APP 32, 275 P.3d 161, IN THE MATTER OF THE STATE IN THE INTEREST OF K.P.
Discussed 2012 OK CIV APP 65, 280 P.3d 366, IN THE MATTER OF R.A.
Cited 2013 OK CIV APP 21, 298 P.3d 544, IN THE MATTER OF L.S.
Discussed at Length 1999 OK CIV APP 32, 976 P.2d 1098, 70 OBJ 1455, In the Matter of E.M.
Discussed 2000 OK CIV APP 98, 12 P.3d 478, 71 OBJ 2398, IN THE MATTER OF K.L.C.
Cited
Oklahoma Supreme Court Cases Cite
Name
Level 1990 OK 89, 801 P.2d 703, 61 OBJ 2374, D.D.F., Matter of
Discussed 2002 OK 83, 64 P.3d 1080, IN THE MATTER OF S.B.C.
Discussed 2011 OK 13, 250 P.3d 320, QUARLES v. PANCHAL
Discussed 1977 OK 91, 564 P.2d 1009, SMITH v. GIZZI
Discussed 1978 OK 94, 580 P.2d 983, MATTER OF CHAD S.
Discussed
Title 12. Civil Procedure Cite
Name
Level 12 O.S. 587, General or Special Verdict
Cited 12 O.S. 588, General Verdict and Particular Findings
Cited